UNDERWOOD LAW FIRM, P.C.
Thomas C. Riney, SBN: 16935100
W. Heath Hendricks, SBN: 24055651
500 South Taylor, Suite 1200, LB 233
Amarillo, Texas 79101
Telephone: (806) 376-5613
Facsimile: (806) 379-0316
Email: tom.riney@uwlaw.com
Email: heath.hendricks@uwlaw.com

Michael R. Johnson (*Pro Hac Vice*)
Matthew M. Cannon (*Pro Hac Vice*)
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
Salt Lake City, Utah 84111
Telephone: (801) 532-1500
Facsimile: (801) 532-7543
Email:  mjohnson@rqn.com
Email: mcannon@rqn.com

*Attorneys for Plaintiff Rabo AgriFinance LLC*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS, AMARILLO DIVISION

| | |
|---|---|
| IN RE:<br><br>McCLAIN FEED YARD, INC., McCLAIN FARMS, INC., and 7M CATTLE FEEDERS, INC.,<br><br>    Debtors.[1] | Chapter 7<br><br>CASE NO. 23-20084-rlj<br><br>Jointly Administered |
| RABO AGRIFINANCE LLC,<br><br>    *Plaintiff,*<br>v.<br><br>ACEY LIVESTOCK, LLC et al.,<br><br>    *Defendants.*[2] | **ADV. PROC. NO. 23-02005-rlj**<br><br>**Honorable Robert L. Jones** |

[1] The Debtors in these jointly administered cases are: (1) McClain Feed Yard, Inc. (Case No. 23-20084); (2) McClain Farms, Inc. (Case No. 23-20885); and (3) 7M Cattle Feeders, Inc. (Case No. 23-20886). All three cases are being jointly administered under the case number for McClain Feed Yard, Inc.

[2] The Defendants named in the Complaint are ACEY LIVESTOCK, LLC; MICHAEL ACEY; STAN E. AYERS, JR.; ARNOLD BRAUN TRUST; ARNOLD BRAUN; ROBERT BRAUN; BAR D RANCH LAND & CATTLE LLC; N.

## BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, Federal Local Rules 7.1 and 56.5, Federal Rule of Bankruptcy Procedure 7056 and Federal Bankruptcy Local Rules 7007-2 and 7056-1, Plaintiff, Rabo AgriFinance LLC ("**RAF**"), through its counsel of record, hereby files its brief in support of its motion for partial summary judgment, of even date.

---

TERRY DICKS; BARRETT'S LIVESTOCK INC.; DON RALPH BARRETT; BELLA ELEGANCE LLC; BIG SEVEN CAPITAL PARTNERS, LLC; DORA BLACKMAN; BRYAN BLACKMAN; EDDIE BRYANT; BRENT BURNETT; JOE BURNETT; TERRY BURNETT; BUSS FAMILY TRUST; EDWIN D. BUSS; DENNIS BUSS; C HEART RANCH, LLC; COLETTE LESH; CARRAWAY CATTLE, LLC; RICHARD CARRAWAY; CURTIS JONES FARMS; DAC83 LLC; ERIC DeJARNATT; DON JONES FARM, INC.; DON JONES TRUCKING, INC.; DUFURRENA CUTTING HORSES; EDWARD LEWIS DUFURRENA; RIETA MAY DUFURRENA; ROBERT ELLIS; MICHAEL EVANS; DOUG FINLEY; GARWOOD CATTLE CO.; JUSTIN GARWOOD; GENE BROOKSHIRE FAMILY, LP; JOEL BROOKSHIRE; GRAY BROTHERS CATTLE; ROBERT GRAY; RONNIE GRAY; JIMMY GREER; GUNGOLL CATTLE, LLC; BRADLEY GUNGOLL; LEAH GUNGOLL; JACE HARROLD; HINES CATTLE COMPANY, LLC; HINES FARMS, LLC; A.J. JACQUES LIIVING TRUST; CORY JESKO; DWIGHT JESKO, JOANN & KEITH BROOKS d/b/a BROOKS FARMS; LARRY KEITH; DUSTIN JOHNSON; DAVID JOHNSON; KINSEY JONES; KINGDOM TRUST; JAMES MCCUAN; KEITH HARRIS; JANICE LAWHON; JAN LESH; MORRISON CAFÉ, LLC; LESH FAMILY TRUST; GARY LESH; JARED LESH; JORDAN LESH, LLC; LFC CATTLE; CHARLES LOCKWOOD; COLE LOCKWOOD; SHERLE LOCKWOOD; NIKKI LOCKWOOD; MAP ENTERPRISES; MIKE GOURLEY;NATALIE MARTUS; JEAN NIX; OPEN A ARENA LLC; BARRY PHILLIPS; DREW PHILLIPS; PRIEST CATTLE COMPANY LTD; PRIEST VICTORY INVESTMENT LLC; CHRISTOPHER PRINCE; PRODUCERS LIVESTOCK COMMISSION; SONNY BARTHOLD; DAVID RAINEY; RAPP RANCH; MARK J. REISZ; RALPH REISZ; RIDGEFIELD CAPITAL ASSET MANAGEMENT; JIM GIORDANO; RILEY LIVESTOCK, INC.; ANGIE ROBINSON; RICK RODGERS; STEVE RYAN; JIM RININGER; SCARLET & BLACK CATTLE, LLC; COLTON LONG; SCOTT LIVESTOCK COMPANY; SHAW & SHAW FARMS PARTNERSHIP LLC; THE UNIVERSITY OF FLORIDA; ROBERT J. SPRING; STARNES CATTLE; JEFF STARNES; EDDIE STEWART; ROBERT STEWART; RACHEL STEWART; SCOTT E. STEWART; STEVE T SCOTT FARMS, INC.; JUSTIN STUEVER; PHILLIP SULLIVAN; AMY SUTTON; CRAIG SUTTON; TGF RANCH LLC; TOM FRITH; THORLAKSON DIAMOND T FEEDERS, L.P.; JOHN TIDWELL; MYKEL TIDWELL; TINDAL TRUCK SALES; JOHN TINDAL; JANET VANBUSKIRK; LYNDAL VANBUSKIRK; SUSAN VAN BUSKIRK; COLBY VANBUSKIRK; CAMERON WEDDINGTON; NANCY WEDDINGTON; WILLIAM WEDDINGTON; WILDFOREST CATTLE COMPANY LLC; WILEY ROBY RUSSELL, JR. as TRUSTEE OF THE W. ROBBIE RUSSELL LIVING TRUST; WJ PERFORMANCE HORSES, INC.; JOB WHITE; and KENT RIES, in his capacity as CHAPTER 7 TRUSTEE OF THE DEBTORS' CONSOLIDATED BANKRUPTCY ESTATE.

# TABLE OF CONTENTS

**SUMMARY** ............................................................................................................ 1

**UNDISPUTED MATERIAL FACTS FOR PARTIAL SUMMARY JUDGMENT** ............... 3

**I.    THE CHALLENGED CLAIMS ARE "INVALID" UNDER THE
DEALER TRUST STATUTE AS A MATTER OF LAW.** ............................ 9

    **A.    The Challenged Claims Paint a Picture of the Massive Ponzi
Scheme.** ............................................................................................. 9

    **B.    The Challenged Claims Do Not Demonstrate Subject
Defendants' Ownership, Cash Sale, or Transfer of Possession
of Cattle to Debtors.** ........................................................................ 16

        **1.    The documents fail to show that Subject Defendants
owned cattle.** ........................................................................ 17

        **2.    There is no evidence that Subject Defendants sold and
transferred possession of cattle to Debtors.** ............................. 19

**II.    THE USDA REPORT AND WORKBOOK FURTHER
DEMONSTRATE THAT THE CHALLENGED CLAIMS ARE
INVALID.** .................................................................................... 21

    **A.    The USDA Report and Workbook are Admissible.** ............................ 21

    **B.    The USDA Report and Workbook are Not Controlling but are
Persuasive.** ....................................................................................... 22

    **C.    The Challenged Claims Were Alleged "Invalid" by the USDA.** .......... 22

**CONCLUSION** ...................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Alkhawaldeh v. Nairn Concrete Services*, *Inc.*, No.14-2140, 2015 WL 3485955
  (E.D. La. 2015) ................................................................................................ 21, 22

*Beech Aircraft Corp. v. Rainey*, 488 U.S. 153 (1988) ................................................ 21

*Ellis v. Int'l Playtex, Inc.*, 745 F.2d 292 (4th Cir. 1984) .......................................... 21

*Haskell v. U.S. Dept. of Agric.*, 743 F. Supp. 765 (D. Kan. 1990) ............................ 21

*Kisor v. Wilkie*, 588 U.S. 558 (2019) ........................................................................ 22

*Kraus v. Shinseki*, 846 F. Supp. 2d 936 (N.D. Ill. 2012) ........................................ 22

*McDonald v. Vilsack,* 68 Agric. Dec. *A (U.S.D.A. 2010) .......................................... 22

*MGIC Indem. Corp. v. Weisman*, 803 F.2d 500 (9th Cir. 1986) ................................ 22

*Smith v. Universal Servs., Inc.*, 454 F.2d 154 (5th Cir. 1972) .................................. 22

*U.S. v. Am. Tel. & Tel. Co.*, 498 F. Supp. 353 (D.D.C. 1980) .................................. 22

*U.S. v. Morales*, 720 F.3d 1194 (9th Cir. 2013) ........................................................ 21

**Statutes**

7 U.S.C. § 182(4) ........................................................................ 8, 16, 17, 19, 20

7 U.S.C. § 217b ........................................................................................................ 1, 7

7 U.S.C. § 217b(a)(1) ................................................................ 1, 8, 16, 17, 19, 20

7 U.S.C. § 217b(b) .............................................................................................. 8, 20

7 U.S.C. § 228b(a) ...................................................................... 8, 16, 17, 19, 20

Ky. Rev. Stat. Ann. § 253.060 .................................................................................. 17

Tex. Agric. Code Ann. § 146.001 .............................................................................. 17

Tex. Bus. & Com. Code Ann. § 2.401 .................................................................. 18, 20

Tex. Bus. Orgs. Code Ann. § 152.051 ........................................................................ 18

Tex. Bus. Orgs. Code Ann. § 152.102(a) .................................................................... 18

**Rules**

Fed. R. Bankr. P. 7056 ................................................................................................................ ii

Fed. R. Civ. P. 56 ....................................................................................................................... ii

Fed. R. Evid. § 201 ................................................................................................................... 22

Fed. R. Evid. § 803(8) .............................................................................................................. 21

Fed. R. Evid. § 803(8)(C) ........................................................................................................ 21

L.B.R. 7056-1 ............................................................................................................................ ii

L.R. 7.1 ...................................................................................................................................... ii

L.R. 56.5 .................................................................................................................................... ii

## SUMMARY

This Adversary Proceeding was initiated to address the dispute between RAF, Defendants, and the Trustee concerning Defendants' purported trust claims against certain Debtors that were submitted to the United States Department of Agriculture ("**USDA**") under 7 U.S.C. § 217b (the "**Dealer Trust Statute**"). Under the Dealer Trust Statute, "all livestock purchased by a dealer in cash sales and all inventories of, or receivables or proceeds from, such livestock shall be held by such dealer in trust for the benefit of all unpaid cash sellers of such livestock until full payment has been received by such unpaid cash sellers." *See* 7 U.S.C. § 217b(a)(1). Payment on a cash sale is due "before the close of the next business day following the purchase of livestock and transfer of possession thereof." *Id.* § 228b(a). Accordingly, no trust is created unless a cattle owner ***actually*** sells and transfers possession of the cattle to a dealer, and then does not receive payment for the sold and delivered cattle. In order to receive the benefits of the Dealer Trust Statute, a purported unpaid cash seller of cattle is required to timely provide notice and documentation to the buyer/dealer and the USDA (a "**Dealer Trust Claim**") demonstrating that the seller is entitled to protection under the Dealer Trust Statute; i.e., the party owned cattle, sold the cattle to the dealer for cash, transferred possession of the cattle, and was not paid.

The Dealer Trust Claims that are the subject of RAF's motion for partial summary judgment (the "**Challenged Claims**") fail to demonstrate that the defendants who submitted these claims (the "**Subject Defendants**") even owned cattle, let alone sold and transferred possession of cattle to Debtors. Instead, the Challenged Claims generally show that the Subject Defendants partnered with certain Debtors in a livestock financing scheme often referred to as a "Cattle Feeding Agreement," whereby the Subject Defendants could purportedly purchase calves from

Debtors, the Debtors would grow the cattle to a certain weight, and then Debtors and Subject Defendants would share in the profits when the cattle were purportedly sold. Glaringly absent from all the Challenged Claims is any documentation suggesting that there were actual cattle purchased pursuant to these "feeding agreements." Predictably, there are also no documents in the Challenged Claims demonstrating that the Subject Defendants subsequently "sold" these "cattle" back to Debtors or anybody else.

The absence of such documentation is not surprising because the livestock financing scheme concocted by the Debtors was a massive Ponzi scheme. This helps explain why when the USDA investigated the $122 million in Dealer Trust Claims against Debtors, it identified approximately $2.9 million in preliminarily "valid" claims of cash sales of actual cattle, approximately $2.6 million in total "trust" assets (proceeds from sale of livestock that remained in inventory and cash assets on hand), and about $119 million of "invalid" claims. If those $119 million in Dealer Trust Claims had really involved the recent sale and transfer of actual cattle to Debtors, then there would have been roughly $119 million in cattle and/or cattle proceeds, which obviously there was not. All the Challenged Claims at issue in this Motion were a part of the $119 million of Dealer Trust Claims deemed invalid by the USDA.

RAF is seeking a partial summary judgment from the Court ordering that the Challenged Claims are "invalid" under the Dealer Trust Statute. This finding can and should be quickly reached upon simple inspection of the attached Challenged Claims. RAF is also providing the Court with the *Investigative Report Synopsis* from the USDA's Packers and Stockyards Division (the "**USDA Report**"), wherein the Challenged Claims were deemed invalid. The USDA Report is not controlling on the Court but provides additional persuasive evidence for this conclusion.

### UNDISPUTED MATERIAL FACTS FOR PARTIAL SUMMARY JUDGMENT

1.      Attached hereto are true and correct copies of documents concerning the Dealer Trust Claims for Dennis Buss, Buss Family Trust, and/or Edwin D. Buss, which documents were provided by the USDA to RAF and the Trustee. (App. 7-37.)

2.      Attached hereto are true and correct copies of documents concerning the Dealer Trust Claims for Eddie Bryant, which documents were provided by the USDA to RAF and the Trustee. (App. 38-45.)

3.      Attached hereto are true and correct copies of documents concerning the Dealer Trust Claims for Gray Brothers Cattle, Robert Gray, and/or Ronnie Gray, which documents were provided by the USDA to RAF and the Trustee. (App. 46-56.)

4.      Attached hereto are true and correct copies of documents concerning the Dealer Trust Claims for Craig and Amy Sutton, which documents were provided by the USDA to RAF and the Trustee. (App. 57-67.)

5.      Attached hereto are true and correct copies of documents concerning the Dealer Trust Claims for Steve Ryan, which documents were provided by the USDA to RAF and the Trustee. (App. 68-78.)

6.      Attached hereto are true and correct copies of documents concerning the Dealer Trust Claims for Janice Lawhon, which documents were provided by the USDA to RAF and the Trustee. (App. 79-87.)

7.      Attached hereto are true and correct copies of documents concerning the Dealer Trust Claims for A.J. Jacques Living Trust, which documents were provided by the USDA to RAF and the Trustee. (App. 88-113.)

8.      Attached hereto are true and correct copies of documents concerning the Dealer Trust Claims for Gungoll Cattle, LLC, Bradley Gungoll, and/or Leah Gungoll, which documents were provided by the USDA to RAF and the Trustee. (App. 114-28.)

9.      Attached hereto are true and correct copies of documents concerning the Dealer Trust Claims for Jan and Gary Lesh, Morrison Café, LLC, Lesh Family Trust, Jordan Lesh, LLC, and/or Jared Lesh, which documents were provided by the USDA to RAF and the Trustee. (App. 129-76.)

10.     Attached hereto are true and correct copies of documents concerning the Dealer Trust Claims for Gene Brookshire Family, LP and/or Joel Brookshire, which documents were provided by the USDA to RAF and the Trustee. (App. 177-86.)

11.     Attached hereto are true and correct copies of documents concerning the Dealer Trust Claim for Doug Finley, which documents were provided by the USDA to RAF and the Trustee. (App. 187-93.)

12.     Attached hereto are true and correct copies of documents concerning the Dealer Trust Claim for Scarlet & Black Cattle, LLC and/or Colton Long, which documents were provided by the USDA to RAF and the Trustee. (App. 194-221.)

13.     Attached hereto are true and correct copies of documents concerning the Dealer Trust Claim for Scott Livestock Company and/or Steve T. Scott Farms, Inc., which documents were provided by the USDA to RAF and the Trustee. (App. 222-69.)

14.     Attached hereto are true and correct copies of documents concerning the Dealer Trust Claim for Robert J. Spring, which documents were provided by the USDA to RAF and the Trustee. (App. 270-85.)

15.     Attached hereto are true and correct copies of documents concerning the Dealer Trust Claim for Michael Evans, which documents were provided by the USDA to RAF and the Trustee. (App. 286-90.)

16.     Attached hereto are true and correct copies of documents concerning the Dealer Trust Claims for Charles, Cole, Nikki, and/or Sherle Lockwood, which documents were provided by the USDA to RAF and the Trustee. (App. 291-304.)

17.     Attached hereto are true and correct copies of documents concerning the Dealer Trust Claims for Janet, Lyndal, Colby and/or Susan VanBuskirk, which documents were provided by the USDA to RAF and the Trustee. (App. 305-96.)

18.     Attached hereto are true and correct copies of documents concerning the Dealer Trust Claim for Jimmy Greer, which documents were provided by the USDA to RAF and the Trustee. (App. 397-406.)

19.     Attached hereto are true and correct copies of documents concerning the Dealer Trust Claims for Dustin Johnson, which documents were provided by the USDA to RAF and the Trustee. (App. 407-14.)

20.     Attached hereto are true and correct copies of documents concerning the Dealer Trust Claims for Dora Blackman, which documents were provided by the USDA to RAF and the Trustee. (App. 415-28.)

21.     Attached hereto are true and correct copies of documents concerning the Dealer Trust Claims for Cory and Dwight Jesko, which documents were provided by the USDA to RAF and the Trustee. (App. 429-52.)

22.     Attached hereto are true and correct copies of documents concerning the Dealer Trust Claim for Angie Robinson, which documents were provided by the USDA to RAF and the Trustee. (App. 453-58.)

23.     Attached hereto are true and correct copies of documents concerning the Dealer Trust Claims for Curtis Jones Farms, Don Jones Farm, Don Jones Trucking, Inc. and/or Kinsey Jones, which documents were provided by the USDA to RAF and the Trustee. (App. 459-96.)

24.     Attached hereto are true and correct copies of documents concerning the Dealer Trust Claims for Hines Cattle Company, LLC and Hines Farms, LLC, which documents were provided by the USDA to RAF and the Trustee. (App 497-508.)

25.     Attached hereto are true and correct copies of documents concerning the Dealer Trust Claims for Thorlakson Diamond T Feeders, L.P., which documents were provided by the USDA to RAF and the Trustee. (App. 509-65.)

26.     On June 9, 2023, with an update on October 12, 2023, the United States Department of Agriculture, Agricultural Marketing Service, Fair Trade Practice Program, Packers and Stockyards Division (the "**USDA AMS FTPP PSD**"), issued its *Investigative Report Synopsis* (the "**USDA Report**"). (A true and correct copy of the USDA Report is attached as App. 566-731.)

27.     The USDA Report provides that there were $122,295,867.46 in total trust claims filed, of which $2,930,940.33 were alleged to be "valid" and $119,364,927.13 were alleged to be "invalid." (App. 569-73.)

28.     The USDA Report provides that the proceeds from the liquidation of Debtors' cattle inventory, plus the cash in the Chase Bank Account, resulted in a total of $2,645,850.14, which the USDA deemed the "Trust Assets." (App. 569-73, 607-25.)

29.      None of the Challenged Claims were identified by the USDA as "apparently valid" under the Dealer Trust Statute. (App. 569-73, 625-731.)

30.      The USDA Report provides that "USDA investigators discerned that the invalid claims were not timely, and/or were part of livestock feeding arrangements comprised of both feeding contracts and/or a fraudulent livestock financial scheme as purported, all of which were not defined as dealer activity subject to the trust." (App. 569-70.)

31.      In connection with the USDA Report, the USDA AMS FTPP PSD prepared and then produced a Microsoft Excel workbook containing four worksheets entitled Contact Info, Claim Analysis, Apparently Valid, and Trust Assets (the "**Workbook**"). (A true and correct copy of the Workbook is attached with the USDA Report as App. 719-31.)

32.      In the Claim Analysis worksheet of the Workbook, all the Challenged Claims were identified as "Apparently Non-Valid." (App. 722-29.)

33.      There is no record of a Dealer Trust Claim having been filed by Defendants Bryan Blackman, Arnold Braun, Arnold Braun Trust, Robert Braun, or Jim Rininger. (App. 566-731.)

## **ARGUMENT**

The Packers and Stockyards Act of 1921 (the "**PSA**") regulates the livestock, meat, and poultry industries and is designed to ensure fair trade and competition in those markets. *See* 7 U.S.C. §§ 181-229. In late 2020, Congress passed the Livestock Dealer Trust Amendment, also known as the Dealer Trust Act, amending the PSA to create a "Dealer Trust," which trust is similar to the Packer Trust that was already contained in the PSA. *See* H.R.133, Consolidated Appropriations Act, 2021, 116th Congress. The Dealer Trust Act is codified at 7 U.S.C. § 217b and adds new section 318 to the PSA (the "**Dealer Trust Statute**" or "**Statute**"). "Congress created

the [Dealer] trust to protect livestock sellers doing business with dealers; the trust is specifically intended to keep inventories of livestock and the proceeds therefrom in trust so that livestock sellers are paid." *Preserving Trust Benefits Under the Packers and Stockyards Act,* 88 FR 41015-01, 2023 WL 4131993 (F.R.), Rules and Regulations, Dept. of Agriculture, June 23, 2023.

Under the Dealer Trust Statute, "all livestock purchased by a dealer in cash sales and all inventories of, or receivables or proceeds from, such livestock shall be held by such dealer in trust for the benefit of all unpaid cash sellers of such livestock until full payment has been received by such unpaid cash sellers." *See* 7 U.S.C. § 217b(a)(1). "Livestock" is defined as "cattle, sheep, swine, horses, mules, or goats—whether live or dead." *Id.* § 182(4). Section 228 of the PSA explains that full payment on a cash sale is due "before the close of the next business day following the purchase of livestock and transfer of possession thereof." *Id.* § 228b(a). Consequently, no trust is created unless a cash seller sells and transfers possession of livestock, e.g., cattle, to a dealer. *Id.* §§ 182(4), 217b(a)(1) & 228b(a). Furthermore, an unpaid cash seller loses the benefit of the trust established by Section 217b(a) if the unpaid cash seller fails to provide written notice to the dealer involved and the USDA "(1) within 30 days of the final date for making a payment under section 228b of this title in the event that a payment instrument has not been received; or (2) within 15 business days after the date on which the seller receives notice that the payment instrument promptly presented for payment has been dishonored." *Id.* § 217b(b).

Here, the Challenged Claims are invalid under the Dealer Trust Statute as a matter of law. The Challenged Claims are void of evidence showing the Subject Defendants even owned cattle, let alone sold or transferred possession of them to Debtors. The invalidity of the Challenged Claims is further supported by the USDA Report, wherein the Challenged Claims were deemed invalid.

## I.     THE CHALLENGED CLAIMS ARE "INVALID" UNDER THE DEALER TRUST STATUTE AS A MATTER OF LAW.

The documents comprising the Challenged Claims fall far short of demonstrating any potentially valid trust claim under the Dealer Trust Statute. (*See generally* App. 7-565.)

### A.     The Challenged Claims Paint a Picture of the Massive Ponzi Scheme.

Although there are some differences between the specific Challenged Claims, there are certain types of documents concerning the so-called Cattle Feeding Agreement partnership that can be found in almost all of these claims. A brief analysis of these documents reveals what was really going on between the Subject Defendants and Debtors and why their partnership never resulted in a cash sale of cattle from the Subject Defendants to Debtors.

The first document is a "bill" or "invoice" from McClain Feedyard Inc. containing a table with five columns: HEAD, SEX, WEIGHT, PRICE/LB, and TOTAL COST (the "**Bill Table**"):

MCCLAIN FEEDYARD INC.
824 MULLINS LANE
BENTON KY. 42025                    BILL TO:  DENNIS BUSS
                                    12/12/2022

| HEAD | SEX | WEIGHT | PRICE/LB | TOTAL COST |
|------|-----|--------|----------|-----------|
| 158 | H | 91909 | 1.6397 | $150,703.19 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | $0.00 | |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | |
| 158 | | | | $150,703.19 |

581.70 lb

(App. 11.) A Bill Table is often followed by another chart entitled "PROJECTED CLOSE OUT" (the "**Projected Close Out**"), which chart includes rows of information from the Bill Table for HEAD, COST, and BOUGHT WEIGHT, along with additional information addressing the $ SOLD, SELL WEIGHT, COST/GAIN, LBS GAINED, AND PROFIT.

| PROJECTED CLOSE OUT | |
|---|---|
| HEAD | 158 |
| COST | 150703.19 |
| BOUGHT WEIGHT | 91909 |
| $ SOLD | 196206.34 |
| SELL WEIGHT | 122450 |
| COST/GAIN | 29013.95 |
| LBS GAINED | 30541 |
| PROFIT | 16489.2 |

(App. 12.)

The figures in the Projected Close Out above for HEAD (158), COST (150703.19) and BOUGHT WEIGHT (91909) are the same figures in the corresponding Bill Table for HEAD, TOTAL COST, and WEIGHT. The remaining five figures in the Projected Close Out contain figures concerning the future projected weight and sales price of the alleged cattle, as well as the projected "COST/GAIN" (the purported expenses to grow and feed the cattle). In the example above, the purported 158 head of cattle would initially cost $150,703.19 to purchase and were projected to be subsequently sold for $196,206.34. After deducting the expenses associated with growing and feeding, i.e., the COST/GAIN of $29,013.95, it was projected that there would be a "PROFIT" of $16,489.20. In other words, the 158 head were projected to sell for $45,503.15 more than the original cost ($196,206.34 minus $150,703.19 equals $45,503.15), and after subtracting

anticipated feeding and growing expenses of $29,013.95, there would be a projected profit of $16,489.20 ($45,503.15 minus $29,013.95 equals $16,489.20).

Some of the Challenged Claims also include a document entitled "Cattle Feeding Agreement" (generally, "**Feeding Agreement**") that addresses the cattle financing scheme/partnership in more detail.

---

**Cattle Feeding Agreement**

Dated 7/12/2022

This agreement exists to identify the partnership of McClain Feedyard and AJ JACQUES LIVING TRUST whom are involved in a cattle feeding arrangement. The arrangement allows for AJ JACQUES LIVING TRUST to purchase the calves from McClain Feedyard in total. At the time of purchase the cattle have also been contracted for sale, at a pre-determined price, after pounds have been added to the cattle through McClain Feedyard feeding them at McClain Feedyard, Friona, TX. McClain Feedyard fattens the cattle by certain feed and ingredients that McClain Feedyard provides at its expense. McClain Feedyard is also responsible for providing processing, medicine, yardage, and trucking at its expense.

As the fattened cattle are delivered, McClain Feedyard will distribute the profit as follows:

Sales price of fattened cattle

Minus

Cost stated above that McClain Feedyard incurs

Minus

Original cost of calves, returned to AJ JACQUES LIVING TRUST

Equals profit

Profit divided 1/3 McClain Feedyard and 2/3 AJ JACQUES LIVING TRUST

This agreement is for 175 head of steers at a total weight of 103145 lbs at a price of 1.773 per pound. Total cost for this group of cattle is $182,876.09 which AJ JACQUES LIVING TRUST has paid to McClain Feedyard. Sales contract for 1.7238 @ 775.

AJ JACQUES LIVING TRUST _[signature]_

McClain Feedyard _[signature]_

---

(App. 90.) The Feeding Agreement provides that the projected "profit" from the partnership would be distributed 1/3 to McClain Feedyard and 2/3 to the Subject Defendant. (AJ Jacques Living Trust in the example above). (*Id.*) The Feeding Agreement also provides that at the time of the alleged purchase of the calves from Debtors, "the cattle have also been contracted for sale at a pre-determined price." (*Id.*) In other words, the Feeding Agreement purports to represent that the alleged calves Subject Defendant could "purchase" from certain Debtors were supposedly already under contract for sale (in three to five months after the cattle are grown) at a pre-determined price (presumably the sales price contained in the Projected Close Out). (*See id.*) Unsurprisingly, none of the Challenged Claims include a copy of this purported futures contract, nor any other document evidencing such a contract. (*See generally* App. 7-565.)[3]

The information in the Feeding Agreement concerning the alleged number of cattle, the price of the cattle, and weight of the cattle typically correlates with any Bill Table and/or Projected Close Out included with the Feeding Agreement in a Challenged Claim. For example, the following Bill Table and Projected Close Out are found on the two pages after the above Feeding Agreement:

---

[3] Based on correspondence in some of the Challenged Claims, it would take about 90-150 days for the "cattle" to be grown before they were "sold" pursuant to one of these futures contracts. (*See, e.g.,* App. 131.) Although not at issue with this Motion, the financial records obtained in this case reveal that it was commonplace for Debtors to send large payments to Subject Defendants *on the same day* as they received a large payment from them, with the Debtors' "return" payment being for a moderately larger amount that is consistent with the purported profits outlined in the Feeding Agreement, Bill Table, and Projected Close Out. In other words, on the very same day that a Subject Defendant would send a payment to Debtors for the cost of the "calves" as outlined in the Bill Table, Debtors would send a moderately larger return payment to the Subject Defendant that accounted for the alleged profit as outlined in the Projected Close Out. Remarkably (i.e., unbelievably) the partnerships obtained the **exact** "projected profits" for **every single lot of calves** that were allegedly "grown" and then "sold" pursuant to these agreements.

**MCCLAIN FEEDYARD INC.**
824 MULLINS LANE
BENTON KY. 42025

BILL TO: A.J JACQUES

7/12/2022

LIVING TRUST DATED
APRIL 21,2000 AS AMENDED
AND RESTARTED

| HEAD | SEX | WEIGHT | PRICE/LB | TOTAL COST |
|------|-----|--------|----------|------------|
| 175 | ST | 103145 | 1.773 | $182,876.09 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | |
| 175 | | | | $182,876.09 |

**PROJECTED CLOSE OUT**

| | |
|---|---|
| HEAD | 175 |
| COST | 182876.09 |
| BOUGHT WEIGHT | 103145 |
| $ SOLD | 233784.44 |
| SELL WEIGHT | 135625 |
| COST/GAIN | 30856 |
| LBS GAINED | 32480 |
| PROFIT | 20052.35 SPLIT |

(App. 91-92.) These documents are consistent in showing that with this particular feeding arrangement, there were allegedly 175 Head to be purchased for $182,876.09 (the COST), with an alleged "futures contract" in place for the subsequent sale of these 175 Head for $233,784.44 (the $ SOLD), with $20,052.35 (the PROFIT) to be split between Debtors and Subject Defendant. (App. 90-93.)

The other types of documents included in the Challenged Claims are closely related to the Bill Table, Projected Close Out, and Feeding Agreement. Some of the Challenged Claims include other forms of invoices (the "**Invoices**") from Debtors to the Subject Defendants for the Subject Defendants' purported purchase of cattle (sometimes with an accompanying Projected Close Out).

(App. 294.) The "TOTAL" for the "Invoice" above corresponds with the "COST" contained in the embedded Projected Close Out. (*Id.*)

Some of the Challenged Claims include documents showing a purported payment from Subject Defendants to Debtors for their investment/purchase (again, sometimes with an associated Bill Table or Invoice). (*See, e.g.,* App. 9-16.) And a small handful of Challenged Claims include documentation showing rejected payments from Debtors to the Subject Defendants apparently pursuant to a Projected Close Out or Close Out. (*See, e.g.,* App. 103-06.)

Finally, the Subject Defendants each included initial "Notice" documents (the "**Initial Notice**") at the front of their Challenged Claims, wherein they attempt to identify the date(s) of the alleged cattle sale(s) to Debtors and the amount(s) for which the cattle were sold.

RECEIVED
APRIL 25, 2023
USDA, AMS, FTPP,
PACKERS &
STOCKYARDS DIVISION
DES MOINES, IA

**DEALER TRUST NOTIFICATION**
**SECTION 318-PACKERS & STOCKYARDS ACT**

April 24, 2023

| | | |
|---|---|---|
| McClain Feed Yard, Inc.<br>320 Schley Street<br>Hereford, Texas 79045 | 7M Feeders, Inc.<br>4010 FM 1057<br>Hereford, Texas 79045 | McClain Farms, Inc.<br>3231 Vanzora Rd.<br>Benton, Kentucky 42025 |
| Riley Livestock, Inc.<br>250 Brittian Rd<br>Mayfield, Kentucky 42066 | Brian McClain<br>824 Mullins Lane<br>Benton, Kentucky 42025 | |

**RE: Failure to Pay For Cattle by McClain Feed Yard, Inc., 7M Feeders, Inc., McClain Farms, Inc., Riley Livestock, Inc., and/or Brian McClain, who shall collectively be referred to as the "Purchasers."**

To Whom It May Concern:

This is to notify you that I have not been paid for livestock purchased by one or more of the Purchasers on the dates and in the amounts as follows (attach additional pages as needed):

| Date of Purchase | Amount Owed |
|---|---|
| 07/26/2023 | 189,965.10 |
| | |
| | |

(App. 79.) In the example above, the Subject Defendant dated her Initial Notice "April 24, 2023,"
and it was stamped received by the USDA on "APRIL 25, 2023," but the claimant identified the
purported cattle "sale" date as July 26, 2023—a date three months in the future. (*Id.*) It appears
that this future "sale" date was the Subject Defendant's best guess as to when the "cattle" she
invested in would be big enough to be sold. Many of the Initial Notices listed the "sale" date as
the date of the Subject Defendants' payment *to* Debtors for the investment/partnership. (*See, e.g.,*
App. 270-75, 286-88.)  There appears to have been some real confusion with most of the Dealer
Trust Claims, which is unsurprising considering the absence of evidence showing the existence of
real cattle, let alone the sale and transfer of such cattle. (*See generally* App. 1-565.)[4]

**B.     The Challenged Claims Do Not Demonstrate Subject Defendants' Ownership,
Cash Sale, or Transfer of Possession of Cattle to Debtors.**

The documents comprising the Challenged Claims fail to evidence that these Subject
Defendants were cash sellers of cattle to Debtors under the Dealer Trust Statute. *See* 7 U.S.C. §§
182(4), 217b(a)(1) & 228b(a). In fact, the Challenged Claims fail to evidence that there were even
any cattle in the first place, let alone that Subject Defendants owned or acquired specific cattle and
then subsequently sold and transferred possession of those cattle to Debtors or anybody else. (*See*
App. 1-565.) Given the absence of actual cattle and the apparent confusion of many of the Subject
Defendants with the scheme and Dealer Trust Act, some of the Initial Notices in the Challenged
Claims are "untimely" or otherwise defective on their face.

---

[4] Although most of the Defendants appear to have been deceived by the scheme, other discovery
in this case suggests the possibility that some of the Defendants may have been active co-
conspirators with Debtors in the Ponzi scheme.

**1.     The documents fail to show that Subject Defendants owned cattle.**

Before a party could qualify as a cash seller of cattle under the Dealer Trust Act, that party would need to own and otherwise have title to the cattle. 7 U.S.C. §§ 182(4), 217b(a)(1) & 228b(a). The Challenged Claims fail to demonstrate any such ownership by Subject Defendants.

As an initial matter, some of the Challenged Claims fail to contain any documentation that the Subject Defendant even made a payment to Debtors for the investment/purported purchase of cattle. (*See* App. 46-56, 114-28, 177-86, 187-93, 407-14, 415-28.) But even where the Challenged Claims contain documents showing payments to Debtors pursuant to a Bill Table, Invoice, and/or Feeding Agreement, the Challenged Claims are void of evidence demonstrating that these payments resulted in Subject Defendants getting title to any actual cattle. (*See generally* App. 1-565.)

There are no documents evidencing the alleged origin of the cattle. (*See generally id.*) There are no documents tracing the purported cattle to an auction at a livestock sales facility or other market agency. (*See generally id.*) There are no Bills of Lading or other cattle transportation documents. (*See generally id.*)[5] And there are no documents showing the marks or brands of the cattle. (*See generally id.*; *see also* Tex. Agric. Code Ann. § 146.001 (providing that if a person sells or transfers cattle "the actual delivery of the animal must be accompanied by a written transfer to the purchaser from the vendor" and the "written transfer must give the marks and brands of the animal and, if more than one animal is transferred, must give the number transferred")); Ky. Rev. Stat. Ann. § 253.060 ("An owner whose brand does not appear in the state report [of registered

---

[5] As is outlined in the USDA Report and Section II below, the Dealer Trust Claims that were alleged preliminarily "valid" by the USDA contained these types of documents. (*See infra* at Argument II; *see also* USDA Report, App. 566-731.)

brands], or a supplement thereto, shall produce evidence of his title to the property in the event of controversy."). There was clearly no sufficient identification of the "cattle" in the documentation such that title or ownership could pass to Subject Defendants. *See* Tex. Bus. & Com. Code Ann. § 2.401. This reality is fatal to the Challenged Claims.

Furthermore, even if there were any actual cattle supporting/underlying the financial transactions between the Debtors and the Subject Defendants, the Feeding Agreements make clear that those cattle would not be the property of any of the Subject Defendants but would be the property of the partnership formed between Debtors and each of the Subject Defendants. *See* Tex. Bus. Orgs. Code Ann. § 152.051 (stating that a partnership exists when there is "an association of two or more persons to carry on a business for profit as owners," and that is true "regardless of whether: (1) the persons intend to create a partnership; or (2) the association is called a 'partnership,' 'joint venture,' or other name"). Under Texas law, property is partnership property "if acquired in the name of: (1) the partnership; or (2) one or more partners, regardless of whether the name of the partnership is indicated, if the instrument transferring title to the property indicates: (A) the person's capacity as a partner; or (B) the existence of a partnership." *Id.* § 152.102(a). Here, the Feeding Agreements expressly provide that its purpose is to "identify the partnership" between the Debtors and Subject Defendant "whom are involved in a cattle feeding arrangement." (App. 90.) Accordingly, even if actual cattle were being acquired pursuant to these arrangements, any such cattle would be the property of the partnership and not the individual Subject Defendants. Tex. Bus. Orgs. Code Ann. § 152.102(a).

The Challenged Claims fail to demonstrate that any actual cattle were even purchased by the Subject Defendants pursuant to their arrangement with Debtors. (*See generally* Challenged

Claims, App. 1-565.) But even if cattle were purchased pursuant to these arrangements, such cattle would be owned by the partnership and not by the Subject Defendants. (*See* Feeding Agreement; Tex. Bus. Orgs. Code Ann. § 152.102(a).) Accordingly, the Subject Defendants never owned any cattle and were thus never even able to potentially become cash sellers of cattle such that they could trigger the protections of the Dealer Trust Act. *See* 7 U.S.C. §§ 182(4), 217b(a)(1) & 228b(a).

**2.      There is no evidence that Subject Defendants sold and transferred possession of cattle to Debtors.**

Given the absence of evidence showing Subject Defendants ever owned cattle, it comes as no surprise that there is no evidence demonstrating that Subject Defendants sold and transferred possession of cattle to Debtors (or anybody else).

Before addressing the lack of documentation showing any sale and transfer of cattle from Subject Defendants to Debtors, it is helpful to step back and question why Debtors would ever be "purchasing" the cattle "back" from Subject Defendants. According to the purported terms of the financial scheme at issue, the "cattle" that the partnership had acquired and were feeding were already contracted for future sale to some purported *third party*. (*See generally* Projected Close Outs; Feeding Agreements.) And it was only after the "fattened cattle are delivered" to that third party that Debtors would "distribute the profits." (Feeding Agreement, App. 90.) The express terms of the Feeding Agreements and Projected Close Outs at issue do not contemplate Debtors "purchasing" the cattle back from their partners/Subject Defendants, but rather expressly provide for the distribution of profits after purported delivery of the cattle to the third party pursuant to the alleged futures contracts. (*See generally* Projected Close Outs; Feeding Agreements.) If there had been real cattle at issue, such cattle were going to be purchased by third parties; but because there were no cattle, the Subject Defendants could look only to Debtors as a possible "purchaser."

19

In any event, the Challenged Claims fall woefully short of demonstrating that the Subject

Defendants sold and transferred any cattle to Debtors or anybody else. Again, there is no evidence

of the alleged origin of the cattle; there is no evidence tracing the purported cattle to an auction at

a livestock sales facility or other market agency; there is no evidence showing the transportation

of cattle; and there is no evidence showing the marks or brands of the cattle. (*See generally*

Challenged Claims, App. 1-565.) In fact, all but one of the claims fail to include a single invoice

*from* Subject Defendants *to* Debtors for the alleged "sale" of cattle. (*See id.*) Furthermore, many

of the Challenged Claims identify an alleged "sales" date that the documents show was the date of

the Subject Defendants' *investment* and payment to Debtors, *not* any sale to Debtors. (*See* App.

46-56, 114-28, 270-85, 286-90.) And some Initial Notices include purported sales dates that were

either so old or that had not even occurred yet that the claim was "untimely" or otherwise defective

on the face of the first page. (*See* App. 7, 46, 57, 79, 88, 114, 194, 270, 286,407; *see also* 7 U.S.C.

§ 217b(b).)[6]

There is simply no evidence that the Subject Claims involved actual cattle, and that the

Subject Defendants owned those cattle and then sold and transferred possession of those cattle to

Debtors. (*See* Challenged Claims, App. 1-565.)[7] Accordingly, these claims are invalid as a matter

of law. *See* 7 U.S.C. §§ 182(4), 217b(a)(1) & 228b(a).

---

[6] RAF has provided the Court with a "demonstrative" table that outlines the contents of the
Challenged Claims contained in the Appendix. This demonstrative can be found at App. 1-6.

[7] In fact, even if there were actual cattle that were purchased by Subject Defendants, those cattle
were allegedly already with Debtors and there could be no transfer of possession because Subject
Defendants were not paid and the cattle were not sufficiently identified in any sales contract or bill
of sale, let alone having that bill of sale recorded in the county clerk's office. *See* Tex. Agric. Code
Ann. § 146.001; Tex. Bus. & Com. Code Ann. § 2.401.

## II.    THE USDA REPORT AND WORKBOOK FURTHER DEMONSTRATE THAT THE CHALLENGED CLAIMS ARE INVALID.

The USDA Report and Workbook provide additional persuasive evidence demonstrating that the Challenged Claims are not valid under the Dealer Trust Act. (*See generally* USDA Report and Workbook, App. 566-731.)

### A.    The USDA Report and Workbook are Admissible.

The USDA Report and Workbook are admissible here as public records. *See* Fed. R. Evid. § 803(8) (public records that describe "factual findings from a legally authorized investigation" are an exception to the rule against hearsay and parties may enter public records into evidence unless "other circumstances indicate a lack of trustworthiness"); *Haskell v. U.S. Dept. of Agric.*, 743 F. Supp. 765, 767-68 (D. Kan. 1990) (applying public records exception to admit into evidence an "investigative report" prepared by an investigative aide who had visited the plaintiff's store and observed the alleged violations under the Food Stamp Program); *Ellis v. Int'l Playtex, Inc.*, 745 F.2d 292, 300 (4th Cir. 1984) (stating that the public record exception "is premised on 'the assumption that a public official will perform his duty properly and the unlikelihood that he will remember details independently of the record'") (*quoting* Fed. R. Evid. § 803(8)(C) advisory committee note); *Alkhawaldeh v. Nairn Concrete Services*, *Inc.*, No.14-2140, 2015 WL 3485955 at *8 (E.D. La. 2015) (admitting into evidence under the public records exception an EEOC determination letter); *see also Beech Aircraft Corp. v. Rainey*, 488 U.S. 153 (1988) (providing that investigative reports that state a conclusion or opinion applying law to facts, if the conclusion is based on a factual investigation and satisfies the trustworthiness requirement of Rule 803(8) are not inadmissible solely because they state a conclusion); *U.S. v. Morales*, 720 F.3d 1194 (9th Cir. 2013) (recognizing that the USDA is a "public office" under the rule by allowing USDA to submit

prepared records and reports into the record); *U.S. v. Am. Tel. & Tel. Co.*, 498 F. Supp. 353 (D.D.C. 1980) (same).

The Court could also consider simply taking judicial notice of the USDA Report and Workbook. *See* Fed. R. Evid. § 201 (providing that facts proper for judicial notice are those facts that are "capable of accurate and ready determination" by reference to sources whose accuracy cannot be reasonably questioned); *see also MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986) (holding that a court may take judicial notice of official records and reports); *Kraus v. Shinseki*, 846 F. Supp. 2d 936, 941 n.6 (N.D. Ill. 2012) (recognizing that the court may take judicial notice of the reports of administrative bodies).

**B.      The USDA Report and Workbook are Not Controlling but are Persuasive.**

The Supreme Court has recognized that administrative agencies have "substantive expertise" in their respective fields. *Kisor v. Wilkie*, 588 U.S. 558, 578 (2019). And although the USDA Report and Workbook are certainly not controlling on the Court,[8] the Court can and should at least look to them as providing persuasive value. *See Smith v. Universal Servs., Inc.*, 454 F.2d 154 (5th Cir. 1972) (holding that a district court deciding a Title VII claim was required to take an EEOC investigative report into consideration because failure to do so would be "wasteful and unnecessary"); *Alkhawaldeh*, 2015 WL 3485955 at *8 (noting that the EEOC report was persuasive, though not binding, upon the determination of the court).

**C.      The Challenged Claims Were Alleged "Invalid" by the USDA.**

In this case, the USDA produced to the Trustee and other interested parties the Dealer Trust Claims, including the Challenged Claims, that were submitted by the Subject Defendants to USDA

---

[8] *See, e.g., McDonald v. Vilsack,* 68 Agric. Dec. *A (U.S.D.A. 2010), 2010 WL 3025816.

in connection with the McClain Debtors and which claims are addressed in the USDA Report and Workbook. (*See generally* USDA Report and Workbook, App. 566-731.) The USDA Report and Workbook do not show that any Dealer Trust Claim was filed by Defendants Bryan Blackman, Arnold Braun, Arnold Braun Trust, Robert Braun, or Jim Rininger (the "**Non-Filing Defendants**"). (*Id.*) The USDA Report and Workbook identify the Dealer Trust Claims received by the USDA as either apparently "Valid Claims" or apparently "Non-Valid Claims." (*See generally id.*)

All the Challenged Claims that are the subject of RAF's present motion were identified by the USDA as apparently "Non-Valid Claims." (App. 569-73, 625-731.) The apparently Non-Valid Claims are described in the USDA Report as follows:

> Claims received from companies and individuals that had ***unsatisfied livestock feeding arrangements*** after purchasing livestock in total from McClain with either written or verbal promise of future sale gains equated to $119,364,927.13 of the trust claims received by USDA . . . These claims were alleged not subject to dealer trust provisions. USDA investigators discerned that ***the invalid claims were not timely, and/or were part of livestock feeding arrangements comprised of both feeding contracts and/or a fraudulent livestock financial scheme as purported, all of which were not defined as dealer activity subject to the trust.***

(App. 569-73 (emphasis added).) The Claim Analysis worksheet of the Workbook specifically identifies all Subject Defendants and identifies their respective claim amounts as an "Apparently Non-Valid Amount." (App. 625-731.) In other words, the USDA found all Challenged Claims as apparently "Non-Valid Claims" under the Dealer Trust Statute. (App. 569-73, 625-731.)

The USDA determined that only seven people/entities appeared to have been unpaid cash sellers under the Dealer Trust State and had apparently "Valid Claims."[9] In describing these

---

[9] The defendants with Apparently Valid Claims as identified by the USDA are Michael Acey and Acey Livestock, LLC; Don Ralph Barrett and Barrett's Livestock, Inc.; JoAnn & Keith Brooks dba Brooks Farms; Riley Livestock, Inc.; Bar D Ranch Land & Cattle; Shaw & Shaw Farms

claims, the USDA Report provides that "[t]he livestock described were not part of a feeding arrangement, and were solely livestock cash sales, in which each unpaid seller sold a product (cattle) to Brian McClain and McClain Farms Inc. with immediate payment expectations upon order fulfillment." (App. 573.) There is also a distinction between the documents submitted by these claimants and the documents submitted by the Subject Defendants, with the former typically including specific invoices to the Debtors for cattle, Bills of Lading and other hauling documents, and auction documents tracing the livestock at issue. (App. 698-718.)

It is also telling that the alleged "Valid Claims" total approximately $2.9 million and the purported trust assets collected from the liquidation of the McClain Debtors' livestock inventory totaled approximately $2.6 million dollars. (App. 566-73.) Had actual cattle been purchased and/or sold in connection with the Challenged Claims and the other apparently "Invalid Claims"—claims totaling over $119 million—it would be expected that there would have been upwards of $119 million of livestock or livestock receivables available to pay those claims. (*See id.*) This just further confirms that the Subject Defendants did not purchase and/or sell livestock and their partnership with the Debtors was a fraudulent cattle financial scheme.

The analysis and conclusions of the USDA as contained in the USDA Report and Workbook can and should provide the Court with additional comfort when concluding that the

---

Partnership LLC; and Jeff Starnes dba Starnes Cattle. (App. 571-72.) None of those defendants are subject to this current motion for partial summary judgment. However, RAF believes that some of the Apparently Valid Claims are in fact "invalid" under the Dealer Trust Statute and/or are inferior to RAF's interests. To the extent required, and to the extent not already addressed in the Court's Scheduling Order governing this case, RAF will file a motion at a later date pursuant to Local Rule 7056-1(b)(2) seeking leave to file a second summary judgment motion on this issue.

Challenged Claims are not valid under the Dealer Trust Statute as a matter of law. (*See generally*

USDA Report and Workbook, App. 566-731.)

## **CONCLUSION**

For the reasons stated herein, RAF respectfully requests that the Court enter partial

summary judgment that the Challenged Claims are neither valid nor payable under the Dealer Trust

Statute and the Subject Defendants and Non-Filing Defendants are not entitled to any funds that

may be subject to the Dealer Trust Statute.

DATED this 26th day of September 2024.

UNDERWOOD LAW FIRM, P.C.
Thomas C. Riney, SBN: 16935100
W. Heath Hendricks, SBN: 24055651
500 South Taylor, Suite 1200, LB 233
Amarillo, Texas 79101
Telephone: (806) 376-5613
Facsimile: (806) 379-0316
Email: tom.riney@uwlaw.com
Email: heath.hendricks@uwlaw.com

Michael R. Johnson (*Pro Hac Vice*)
Matthew M. Cannon (*Pro Hac Vice*)
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
Salt Lake City, Utah 84111
Telephone: (801) 532-1500
Facsimile: (801) 532-7543
Email: mjohnson@rqn.com
Email:  mcannon@rqn.com


*/s/ Michael R. Johnson*
Michael R. Johnson
Matthew M. Cannon

*Attorneys for Rabo AgriFinance LLC*

1682279

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 26, 2024, I electronically filed the foregoing

**MOTION FOR PARTIAL SUMMARY JUDGMENT** with the United States Bankruptcy

Court for the Northern District of Texas by using the CM/ECF system which sent notice to all

registered ECF users in this case.

*/s/   Annette Sanchez* _____