David L. LeBas, SBN 12098600
dlebas@namanhowell.com
NAMAN HOWELL SMITH & LEE PLLC
8310 N. Capital of Texas Highway, Ste. 490
Austin, Texas 78731
Ph. (512) 479-0300
Fax (512) 474-1901

*ATTORNEYS FOR AGTEXAS FARM CREDIT SERVICES*
*AGTEXAS, PCA AND*
*THORLAKSON DIAMOND T FEEDERS, LP*

# IN THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS AMARILLO DIVISION

| | |
|---|---|
| IN RE:<br><br>McCLAIN FEED YARD, INC., McCLAIN FARMS, INC., AND 7M CATTLE FEEDERS, INC.,<br><br>    Debtors. | Case No. 23-20084-rlj<br><br>Chapter No. 7<br><br>Jointly Administered |
| RABO AGRIFINANCE LLC,<br><br>    *Plaintiff,*<br><br>v.<br><br>ACEY LIVESTOCK, LLC et al.,<br><br>    *Defendants.* | **Adv. Proc. No. 23-02005-rlj**<br><br>**Honorable Robert L. Jones** |

### THORLAKSON DIAMOND T FEEDERS, LLC'S RESPONSE TO RABO AGRIFINANCE LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

    Pursuant to Federal Rule of Civil Procedure 56, Federal Local Rules 7.1 and 56.5, Federal

Rule of Bankruptcy Procedure 7056 and Federal Bankruptcy Local Rules 7007-2 and 7056-1,

Defendant Thorlakson Diamond T Feeders, LLC ("Thorlakson"), through its counsel of record, hereby files its brief in opposition to the motion for partial summary judgment filed by Rabo AgriFinance LLC ("Rabo") (Doc 191).

# TABLE OF CONTENTS

I. Standing ................................................................................................................. 4

    a. Rabo lacks standing under Bankruptcy law ................................................ 4

    b. Rabo lacks standing under the Dealer Trust Act ........................................ 5

II. Alternatively, fact issues remain as to whether Rabo may otherwise avoid Dealer Trust Act claims under the Act's safe-harbor provision. ............................................. 6

    a. "Notice" and "good faith" under the Act's safe-harbor provision ............... 7

    b. The evidence of good faith and notice in this case thus far points to Rabo's failure to qualify under the safe harbor or at a minimum warrants further discovery. ................... 9

**Certificate of Service** ................................................................................................ 14

# TABLE OF AUTHORITIES

**Cases**

*Horton v. O'Cheskey (In re Am. Hous. Found.)*, 544 Fed. Appx. 516, 520 (5th Cir. 2013) ........... 8

*Brown v. Third Nat'l Bank (In re Sherman),* 67 F.3d 1348, 1355 (8th Cir. 1995) ......................... 8

*C.H. Robinson Co. v. Tr. Co. Bank, N.A.*, 952 F.2d 1311, 1315 n.4 (11th Cir. 1992) ..................... 8

*GE Capital Commer., Inc. v. Wright & Wright, Inc.*, Civil Action No. 3:09-CV-572-L, 2011 U.S. Dist. LEXIS 3962, 2011 WL 124237, *5 (N.D. Tex. Jan. 13, 2011) ........................................ 8

*Hager v. DBG Partners, Inc.*, 903 F.3d 460, 468 (5th Cir. 2018) ...................................................... 9

*Kangaroos U.S.A., Inc. v. Caldor, Inc.*, 778 F.2d 1571, 1573 (Fed. Cir. 1985) .............................. 9

*Begier v. I.R.S.*, 496 U.S. 53, 59 (1990) ............................................................................................ 4

*Highland Capital Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas Petroleum, Inc.)*, 522 F.3d 575, 585 (5th Cir. 2008) ....................................................................................................... 4

*Warth v. Seldin*, 422 U.S. 490, 498-99 (1975) ................................................................................. 5

**Statutes**

11 U.S.C. §548(c) ............................................................................................................................... 8

30 T.A.C. § 321.32(2),(14) ............................................................................................................... 9

30 T.A.C. Ch. 321 ............................................................................................................................. 9

7 U.S.C. § 201(d) ............................................................................................................................... 5

7 U.S.C. § 217b(e) ............................................................................................................................. 7

7 U.S.C. § 217b(f) ......................................................................................................................... 4, 5

UCC at § 1.201(b)(20) ...................................................................................................................... 7

UCC at § 1.201(b)(29) ...................................................................................................................... 7

**Summary of Argument**

Rabo's motion for partial summary judgment should be denied because it lacks standing to pursue the relief sought by the motion. Rabo is a creditor and the relief it seeks is not available to it either under bankruptcy law or the terms of the Dealer Trust Act itself. Even if Rabo does have standing, there are fact issues that preclude summary judgment as to Rabo's status as a purchaser in good faith that would enable it to claim an interest pursuant to the safe harbor provision of the Dealer Trust Act. As a result, Rabo's motion should be denied.

I.  **Standing**

Rabo lacks standing to assert the declaratory relief sought in its motion either under Bankruptcy law principles in general or under the specific language of the Dealer Trust Act itself.

    a.  **Rabo lacks standing under Bankruptcy law**

Trust assets are not property of the estate, and therefore decisions about whether claims are perfected under the Dealer Trust Act will affect the assets of the estate. *See Begier v. I.R.S.*, 496 U.S. 53, 59 (1990) (money held in trust for another is not property of debtor for purposes of determining preferences under the bankruptcy code). The bankruptcy Trustee, not a creditor like Rabo, has standing to contest claims that are property of the estate. *See Highland Capital Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas Petroleum, Inc.)*, 522 F.3d 575, 585 (5th Cir. 2008). In addition, the Dealer Trust Act authorizes only three parties to enforce the trust: the dealer itself, a party appointed by the USDA, or an unpaid seller of livestock. *See* 7 U.S.C. § 217b(f). Rabo is not on this list.

Standing is jurisdictional, and is recognized only in those facing a direct injury, not mere collateral parties. As the Supreme Court recognized in the context of declaratory actions,

> In its constitutional dimension, standing imports justiciability: whether the plaintiff has made out a "case or controversy" between himself and the defendant within the meaning of Art[icle] III. This is the threshold question in every federal case, determining the power of the court to entertain the suit. As an aspect of justiciability, the standing question is whether the plaintiff has "alleged such a personal stake in the outcome of the controversy" as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf. The Art[icle] III judicial power exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally. A federal court's [declaratory judgment] jurisdiction therefore can be invoked only when the plaintiff himself has suffered "some threatened or actual injury resulting from the putatively illegal action. . . ."

*Warth v. Seldin*, 422 U.S. 490, 498-99 (1975) (internal citations omitted).

### b. Rabo lacks standing under the Dealer Trust Act

The Dealer Trust Act requires a dealer to hold "livestock purchased by a dealer in cash sales and all inventories of, or receivables or proceeds from, such livestock" in trust provides for the benefit of the unpaid cash sellers. 7 U.S.C. § 217b(a). "The term 'dealer' means any person, not a market agency, engaged in the business of buying or selling in commerce livestock, either on his own account or as the employee or agent of the vendor or purchaser." 7 U.S.C. § 201(d). This definition does not include the dealer's lenders.

The statute has a subsection dedicated to enforcement. 7 U.S.C. § 217b(f), titled "Enforcement," reserves enforcement of the Act solely to

(1) The Secretary of Agriculture to appoint an independent trustee to preserve and enforce the trust;
(2) The Secretary to serve as an independent trustee;
(3) The Secretary to file suit to preserve and enforce the trust; and
(4) Unpaid sellers to file suit to preserve and enforce the trust.

7 U.S.C. § 217b(f).

In this case, the original trustee of the dealer trust was the Debtor, McClain. The Bankruptcy Trustee steps into McClain's shoes as the successor to McClain. While the Act permits the Secretary of Agriculture to appoint an independent trustee, act as an independent trustee, or

bring action to enforce the trust, he has not done so. Therefore, any dispute under the Dealer Trust Act is between the Bankruptcy Trustee as successor to McClain and the various sellers protected by the Act.

Rabo financed McClain. It is not an unpaid cash seller, is not the dealer, and does not stand in the shoes of the dealer. Although Rabo may benefit collaterally from the Court's decisions regarding Dealer Trust Act claims, that collateral benefit does not confer standing.

Moreover, granting Rabo the authority to seek declaration about whether claims are perfected puts Rabo in a conflict of interest. It would benefit by a decision that claims are not perfected dealer trust claims because this would limit its exposure to disgorgement claims.

II. **Alternatively, fact issues remain as to whether Rabo may otherwise avoid Dealer Trust Act claims under the Act's safe-harbor provision.**

Alternatively, if Rabo has standing to litigate the dealer trust claims directly, there are fact issues that preclude summary judgment on its motion. Rabo's interest under the Dealer Trust Act is based on the safe harbor in the Act for "purchasers" who act "in good faith without notice that transfers were a breach of trust." As recounted below, based on the limited discovery that has occurred thus far, there are fact issues about whether Rabo acted in good faith and without notice that transfers to it by McClain were the result of breach of trust by McClain. At the least, further discovery on this issue is warranted before any summary judgment could be issued.

In addition, discovery is needed on the topic of Rabo's actions taken or not taken with respect to the enactment of the Dealer Trust Act in December of 2021. Rabo has argued that the Act does not apply to it because its loan to McClain originated before the effective date of the Act. See Dkt. 134, at pages 6 - 9. Rabo has provided no discovery on how it took or did not take the Act into account in its dealings with McClain, a dealer.

### a. "Notice" and "good faith" under the Act's safe-harbor provision

A safe harbor provision in the Act provides that a "person purchasing livestock subject to a dealer trust shall receive good title to the livestock if the person receives the livestock (A) in exchange for payment of new value; and (B) in good faith without notice that the transfer is a breach of trust." 7 U.S.C. § 217b(e). Assuming that Rabo, as a lender, would qualify as a "person purchasing," the record thus far demonstrates facts issues on, and shows that further discovery is needed to determine, whether it acted "in good faith without notice that the transfer is a breach of trust."

Many of the terms of the safe-harbor provision, including "person purchasing," "new value," "good faith," and "without notice," are not defined either in the PSA or the Dealer Trust Act. The courts are left to determine what constitutes good faith and whether notice is actual, constructive, inquiry, or otherwise. And because the Dealer Trust Act is relatively new and has yet to be analyzed by the courts, the terms have likewise not been defined by common law specific to the Act.[1]

The Uniform Commercial Code, at § 1.201(b)(29), defines purchase to include "taking by …security interest…" Although "good faith" is undefined in the Dealer Trust Act, it is defined by state law in the UCC at § 1.201(b)(20): "'Good faith,' except as otherwise provided in Chapter 5 [letters of credit], means honesty in fact and the observance of reasonable commercial standards of fair dealing." Black's Law Dictionary (9th ed. 2009) (defining "good faith" as "honesty in belief," "faithfulness to one's duty or obligation," and "observance of reasonable commercial standards of fair dealing in a given trade or business").

---

[1] As of the date of this Response, no court decisions have cited to the Dealer Trust Act, according to a LexisNexis *Shepard's* search.

Addressing "good faith" in the safe harbor of 11 U.S.C. §548(c), where the term is also not defined, the 8th Circuit summarized it as follows, demonstrating the interplay between good faith and notice:

> Good faith is not susceptible of precise definition and is determined on a case-by-case basis. *In re Roco Corp.,* 701 F.2d 978, 984 (1st Cir. 1983). To determine whether a transferee acts in good faith, "courts look to what the transferee objectively 'knew or should have known'" instead of examining the transferee's actual knowledge from a subjective standpoint. *In re Agricultural Research & Technology Group, Inc.,* 916 F.2d 528, 535-36 (9th Cir. 1990); *cf. Bonded Fin. Servs. v. European Am. Bank,* 838 F.2d 890, 897-98 (7th Cir. 1988) (analyzing good faith under § 550(b)). In other words, a transferee does not act in good faith when he has sufficient knowledge to place him on inquiry notice of the debtor's possible insolvency. *In re Anchorage Marina, Inc.,* 93 B.R. 686, 693 (Bankr. D.N.D. 1988); *see also* 4 *Collier*, at 548-72 -73.

*Brown v. Third Nat'l Bank (In re Sherman),* 67 F.3d 1348, 1355 (8th Cir. 1995); *accord, Horton v. O'Cheskey (In re Am. Hous. Found.)*, 544 Fed. Appx. 516, 520 (5th Cir. 2013) (for good faith under Bankruptcy § 548(c), once circumstances specific to the transfer put transferee on inquiry notice of insolvency or fraud, transferee must satisfy a "diligent investigation" requirement).

Likewise, under the Perishable Agricultural Commodities Act's statutory trust for sellers, notice of a breach of trust arises when a party seeking safe harbor "has actual knowledge of the breach or when he has knowledge of such facts that he should ascertain by inquiry whether the trustee is committing a breach of trust." *C.H. Robinson Co. v. Tr. Co. Bank, N.A.*, 952 F.2d 1311, 1315 n.4 (11th Cir. 1992) (quoting 4 Austin W. Scott & William F. Fratcher, *The Law of Trusts* § 297 (4th ed. 1989)).

The inquiries about knowledge and good faith present fact questions for the court. *See, e.g.*, *Horton*, 544 F. Appx. at 520 (applying "clear factual error" review to bankruptcy court's determination regarding good faith and notice for purposes of 11 U.S.C. § 548(c)); *GE Capital Commer., Inc. v. Wright & Wright, Inc.*, Civil Action No. 3:09-CV-572-L, 2011 U.S. Dist. LEXIS 3962, 2011 WL 124237, *5 (N.D. Tex. Jan. 13, 2011) (good faith and notice under the Texas

Uniform Fraudulent Transfer Act are fact questions); *Hager v. DBG Partners, Inc.*, 903 F.3d 460, 468 (5th Cir. 2018) (good faith compliance with COBRA is a fact question); *Kangaroos U.S.A., Inc. v. Caldor, Inc.*, 778 F.2d 1571, 1573 (Fed. Cir. 1985) (good faith and scienter in patent cases are fact questions).

      **b. The evidence of good faith and notice in this case thus far points to Rabo's failure to qualify under the safe harbor or at a minimum warrants further discovery.**

The evidence to date regarding the good faith/without notice element required for the safe harbor to apply to Rabo is incomplete, but already it indicates a lack of good faith and gives rise to a fact issue as to whether Rabo would qualify as a purchaser "in good faith without notice that the transfer is a breach of trust."

Rabo lent money to McClain on a borrowing base.[2] To track the collateral (cattle) supporting the borrowing, McClain provided monthly borrowing base certificates to Rabo.[3] These certificates represented how many cattle McClain claimed to own, and where those cattle were located.

One of the locations where McClain had cattle was the McClain Feed Yard in Hereford. McClain Feed Yard was permitted by Texas Commission on Environmental Quality as a Concentrated Animal Feeding Operation (CAFO), with an operating capacity of 3,000 head.[4] A CAFO is a penned feedlot with a threshold number of animals that does not sustain vegetation or forage. 30 T.A.C. § 321.32(2), (14). CAFOs are closely regulated and permitted based on numerous factors, including physical area, capacity for animals, capacity for waste, water runoff, air quality, odor, and buffer zones. *See generally* 30 T.A.C. Ch. 321. The appraisal report

---

[2] Exhibit A at Appx. 2.
[3] See, e.g., Exhibits E-O at Appx. 32-205.
[4] Exhibit B at Appx. 11-12.

submitted to Rabo in connection with its loan to McClain Feed Yard said that the "maximum legal capacity" of the feedyard was 3,000 head.[5] A Credit Report dated July 1, 2022 referred to the CAFO permit head count limitations.[6]

Despite the limitations—both physical and permitted—McClain regularly reported an ever-increasing head count to Rabo far in excess of the permitted amount. At the initiation of Rabo's lending facility in spring of 2018, McClain was already reporting a head count nearly three times the permitted capacity in the McClain Feed Yard. By December of 2022, McClain reported to Rabo that it had almost 38,000 cattle in the McClain Feed Yard—more than 12 times the permitted capacity:

| Certificate[7] | Head Claimed at McClain Feed Yard | % Capacity |
|---|---|---|
| 4/30/2018 | 8,651 | 288% |
| 7/31/2018 | 9,971 | 332% |
| 10/31/2018 | 10,050 | 335% |
| 1/31/2019 | 10,145 | 338% |
| 4/30/2019 | 12,494 | 416% |
| 7/31/2019 | 15,514 | 517% |
| 10/31/2019 | 16,414 | 547% |
| 1/31/2020 | 19,441 | 648% |
| 4/30/2020 | 20,651 | 688% |
| 7/31/2020 | 21,191 | 706% |
| * * * | | |
| 12/31/2022 | 37,924 | 1264% |

No mention of this huge discrepancy has been found in Rabo's records.

Rabo was supposed to make twice-yearly collateral inspections to the McClain Feed Yard and other facilities but this request was apparently reduced to yearly inspections.[8] Although the

---

[5] Exhibit C at Appx. 15, 18, 26
[6] Exhibit D dated 7/01/22 at Appx. 28, 29 ("permitted for 3k").
[7] Exhibit E at Appx. 33 (4/30/2018); Exhibit F at Appx. 50 (7/31/2018); Exhibit G at Appx. 60 (10/31/2018); Exhibit H at Appx. 71 (1/31/2019); Exhibit I at Appx. 82 (4/30/2019); Exhibit J at Appx. 93 (7/31/2019); Exhibit K at Appx. 114 (10/31/2019); Exhibit L at Appx. 134 (1/31/2020); Exhibit M at Appx. 159 (4/30/2020); Exhibit N at Appx. 179 (7/31/2020); Exhibit O at Appx. 205 (12/31/2022).
[8] Exhibit P at Appx. 207, 209.

inspection reports claim that the scope of the inspection included a review of borrowing base submissions, the reports say nothing about the difference between reported head counts on the borrowing base and permitted head counts.[9]

The circumstantial and direct evidence shows that Rabo knew or should have known of McClain's breaches as early as April 2022, when it performed a collateral inspection.[10] According to this inspection report, "the Company is struggling to keep up with their bookkeeping function and at the time of this inspection did not provide accurate numbers on the submitted BBC [Borrowing Base Certificate]."[11]

The inspector noted that the McClain Entities had a large account receivable for feed relating to cattle that were owned by various customers.  The account receivable noted in the inspection report said: "Feed A/R above is owed by various customers who are currently feeding at the feedyard in TX," confirming that not all cattle at McClain facilities were company owned by McClain.[12]

Moreover, Rabo's inspector acknowledged reviewing bank statements of the McClain Entities for March 2022, in collaboration with Mechanics Bank.  The inspector "realized that a large error had been made and many outstanding checks had been unreported."[13]  The McClain Entities had understated the number of outstanding checks by $3,378,250. This error, according to Rabo, demonstrated the "heightened need for an in-house accountant who can enter all transactions daily."[14]

---

[9] Exhibit Q (9/9/21) at Appx. 211-219; Exhibit R (5/11/22) at Appx. 221-231.
[10] Exhibit R at Appx. 221.
[11] Exhibit R at Appx. 222.
[12] Exhibit R at Appx. 227.
[13] Exhibit R at Appx. 227.
[14] Exhibit R at Appx. 223.

In the February 2023 report, the inspector noted that the McClain Entities' documentation of their financial transactions had been a concern since the inception of the loan in 2018. The report said: "High information risk has been cited in every inspection since the prefunding and Client has always indicated they would improve."[15] Rabo's inspector noted that in the summer of 2022, after Brian McClain had an accident, "The loan became overdrawn and overline for months at a time."[16]

In February 2023 Rabo conducted a collateral inspection at the McClain Entities' facilities in Texas and confirmed that the McClain operation was in distress. Rabo's inspector reported that the McClain Entities were short by thousands of cattle worth millions of dollars.[17] The report stated, "**This is basically a worst-case scenario**." The report also stated: "Large negative borrowing base after adjustments for cattle. **Possible Fraud Case.** Recommendation to Downgrade immediately **and take control of cattle as soon as possible due to concerns related to cattle being owned by other parties**."[18] The inspection report failed to note the existence of the Intercreditor Agreement dated January 27, 2021, between Rabo and AgTexas, a lender to Thorlakson.[19]

Despite the findings from the February 2023 inspection, Rabo did not shut down the McClain Entities' operation or inform any others of the scheme, and instead allowed innocent customers of McClain to continue to pay millions of dollars to McClain, which Rabo then collected.

---

[15] Exhibit S at Appx. 235.
[16] Exhibit S at Appx. 236.
[17] Exhibit S at Appx. 233, 234.
[18] Exhibit S at Appx. 233 (emphasis added).
[19] Exhibit T at Appx. 243 (The agreement provided that both lenders agreed that cattle owned by their respective borrowers would not be subject to a security interest held by the other.)

Though incomplete, this evidence shows that fact issues exist as to whether Rabo qualifies as a good faith purchaser entitled to protection under the safe harbor of the Dealer Trust Act.

For some or all of the time of Rabo's loan to McClain, Jason Dunn was Rabo's credit analyst on the McClain file.[20]  Further discovery is needed from Mr. Dunn, the collateral inspectors, or other individuals at Rabo's about its status as a good faith purchaser.

### III. Conclusion and Prayer

WHREREFORE, Thorlakson Diamond T Feeders, LLC, prays that Rabo AgriFinance LLC's motion for partial summary judgment be denied, that discovery be conducted on Rabo's status as an alleged good faith purchaser entitled to protection under the safe harbor provision of the Dealer Trust Act, and for general relief.

DATED this 18th day of October, 2024.

    Respectfully submitted,

    NAMAN HOWELL SMITH & LEE, PLLC
    8310 N. Capital of Texas Hwy., Suite 490
    Austin, Texas 78731
    (512) 479-0300
    (512) 474-1901 (FAX)
    Email:  dlebas@namanhowell.com

    BY:  */s/ David L. LeBas*
        David L. LeBas
        State Bar No. 12098600

    **ATTORNEYS FOR THORLAKSON DIAMOND T FEEDERS, LP, AGTEXAS FARM CREDIT SERVICES AND AGTEXAS PCA**

---

[20] Exhibits Q-S at Appx. 210-242.

## Certificate of Service

The undersigned attorney hereby certifies that a true and correct copy of the foregoing was served through the Bankruptcy Court's Electronic Case Filing System upon counsel of record who have consented to such service on October 18, 2024.

*/s/ David L. LeBas*
David L. LeBas